UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>**KB US Holdings, Inc.,** *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 20-22962<br><br>(Joint Administration Requested) |

**DECLARATION OF SCOTT MOSES IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF (I) ORDER (A) AUTHORIZING PERFORMANCE UNDER THE STALKING HORSE PURCHASE AGREEMENT, (B) APPROVING BIDDING PROCEDURES FOR THE SALE OF ASSETS, (C) SCHEDULING HEARINGS AND OBJECTION DEADLINES WITH RESPECT TO THE SALE, (D) SCHEDULING BID DEADLINE AND AN AUCTION, (E) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (F) APPROVING CONTRACT ASSUMPTION AND ASSIGNMENT PROCEDURES, AND (G) GRANTING RELATED RELIEF; AND (II) ORDER (A) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR, (B) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF**

I, Scott Moses, hereby declare under penalty of perjury:

1. I am a Managing Director with PJ Solomon, L.P. ("**Solomon**"), a leading financial advisory and investment banking firm and the proposed investment banker to the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") in these chapter 11 cases. In March 2019, Solomon was engaged to serve as investment banker to the Debtors. I submit this declaration in support of the relief requested in the *Debtors' Motion for Entry of (I) Order (A) Authorizing Performance Under the Stalking Horse Purchase Agreement, (B) Approving Bidding Procedures for the Sale of the Assets, (C) Scheduling Hearings and Objection Deadlines with*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: KB US Holdings, Inc. (1000), KB Holding, Inc. (3082), AG Kings Holdings Inc. (8681), AG Holdings II Inc. (3828), Kings Super Markets, Inc. (6769), Balducci's Holdings LLC (1913), Balducci's Connecticut LLC (1945), Balducci's Maryland LLC (1926), Balducci's Virginia LLC (1949), and Balducci's New York LLC (1934). The location of the Debtors' corporate headquarters is 700 Lanidex Plaza Parsippany, NJ 07054.

*Respect to the Sale, (D) Scheduling Bid Deadline and an Auction, (E) Approving the Form and Manner of Notice Thereof, (F) Approving Contract Assumption and Assignment Procedures, and (G) Granting Related Relief; and (II) Order (A) Authorizing the Sale of the Assets Free and Clear, (B) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* (the "**Motion**").[2]

2. Unless otherwise indicated, all facts set forth in this declaration are based upon (a) my participation in and oversight of the Debtors' marketing and sale processes, (b) personal knowledge gleaned during the course of my engagement with the Debtors, (c) information learned from my review of relevant and operational data regarding the Debtors, (d) information received from members of the Debtors' management and/or their other advisors, and (e) my past experience advising both distressed and non-distressed companies and their stakeholders.

3. I am authorized to submit this declaration on behalf of the Debtors and, if called upon to testify, I could and would testify competently to the facts set forth herein.

## Qualifications

4. I have more than 19 years of experience advising companies and other constituents on strategic and financial matters, with a particular focus on mergers, acquisitions, sales, and divestitures of traditional and specialty grocers. I joined Solomon as a Managing Director, Head of Food Retail & Restaurants Investment Banking and a member of Solomon's Operating Committee in 2016. Before joining Solomon, I was the Head of Food, Drug and Specialty Retail Investment Banking at Sagent Advisors, prior to which I worked in the retail investment banking groups at JPMorgan, Citigroup, and Dresdner Kleinwort Wasserstein. I

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Motion.

received a B.A. from the University of Pennsylvania and a J.D. and M.B.A. from Columbia University.

5. Founded in 1989, Solomon is a leading investment banking advisory firm that provides strategic and financial advisory services in connection with mid- to large-scale corporate restructuring transactions. Solomon's professionals have extensive experience in providing financial advisory and investment banking services to companies across a range of industries as well as to financially distressed companies and creditors, equity holders, and other constituencies in reorganization proceedings and complex financial restructurings, both in and out of court. Solomon was engaged by the Debtors on a prepetition basis to act as their investment banker in connection with their restructuring initiatives. During the lead up to these chapter 11 cases, Solomon acquired significant knowledge of the Debtors' business, including their financial affairs, debt structure, business operations, capital structure, key stakeholders, and related matters.

6. Solomon's Food Retail Advisory Group provides investment banking advisory services to public and private clients across various food retail sectors, including traditional and specialty grocery stores, drug stores, club stores, convenience stores, wholesalers, and restaurants. The members of Solomon's Food Retail Advisory Group have extensive experience in the food retail sector, including working (both at Solomon and at prior firms) with clients such as Fairway Market, on its sale of assets to Village Supermarket, Seven Seas Georgetowne, Bogopa and Amazon; Kroger, on its $800 million acquisition of Roundy's; Lucky's Market, on its sale of a meaningful equity stake to Kroger, and subsequent sale of assets to Aldi, Publix, Southeastern Grocers, Dollar General, Schnucks, et.al.; Save A Lot, on its recapitalization; Sprouts Farmers Market, on its merger with Henry's Farmers Market (owned at the time by Apollo); Sunflower Farmers Market, on its sale to Sprouts Farmers Market; Mi Pueblo, on its sale

3

to KKR; New Seasons, on its sale to Good Food Holdings/Emart; Fred's, on its sales of prescription assets to CVS and Walgreens; Martin's, on its sale to SpartanNash; Best Market, on its sale to Lidl; Supervalu, on its sale of Shop & Save to Schnucks; El Rancho, on its sale of growth equity to Albertsons; Central Grocers, on its sale of Strack & Van Til to Indiana Grocery Group and its distribution of assets to Supervalu; Marsh Supermarkets, on its sales of assets to Kroger and Fresh Encounter; Southeastern Grocers, on its sales of selected prescription assets to CVS Health and Walgreens, as well as its pending sale of various Bi-Lo assets to Food Lion, a subsidiary of Royal Ahold; Fresh & Easy, on the sale of its produce manufacturing facility to Calavo Growers; United Supermarkets on its sale to Albertson's; Haggen Food & Pharmacy, on the sales of its core business to Albertson's, its non-core stores to various retailers and its previous sale to Comvest Partners; Briar Development, on the sale of its portfolio of various Haggen real estate assets to Merlone Geier; Pro's Ranch Markets, on the sale of its California region stores to Vallarta Supermarkets; Jean Coutu, on its sale of Eckerd Drug and Brooks Pharmacy to Rite Aid; Ahold, on its sale of U.S. Foodservice to KKR and CD&R; and Cerberus Capital, on its original acquisition of Albertson's non-core stores.

7.      In addition, Solomon and its professionals have assisted and advised numerous companies from a variety of industries in complex restructurings, both out of court and in chapter 11 cases. Solomon professionals have been retained in numerous large, complex chapter 11 cases, including, among others, *In re Fairway Group Holdings Corp.*, Case No. 20-10161 (JLG) (Bankr. S.D.N.Y. Mar. 4, 2020); *In re iPic-Gold Class Entertainment,* LLC, Case No. 19-11739 (LSS) (Bankr. D. Del. August 5, 2019); *In re Payless Holdings LLC*, Case No. 19-40883 (Bankr. E.D. Mo. Mar. 19, 2019); *In re Marsh Supermarkets Holding, LLC*, Case No. 17-11066 (BLS) (Bankr. D. Del. June 5, 2017); *In re Quicksilver, Inc.*, Case No. 15-11880 (Bankr. D. Del. Oct. 28,

4

2015); *In re HH Liquidation, LLC (f/k/a In re Haggen Holdings, LLC)*, Case No. 15-11874 (KG) (Bankr. D. Del. Oct. 8, 2015); and *In re The Dolan Company*, Case No. 14-10614 (Bankr. D. Del. Apr. 15, 2014).

### **Prepetition Marketing Process**

8. In February 2019, the Debtors engaged Solomon to serve as their investment banker in order to, among other things, market substantially all of their assets (the "**Assets**") for a potential sale. After exploring various possible avenues for resolving the Debtors' financial challenges, the Debtors, in consultation with Solomon, determined that an expeditious sale of the Assets was necessary to maximize the value of the Debtors' business. Accordingly, beginning in March 2019, Solomon commenced a marketing process of the Assets for a going concern sale, overseen by the Debtors' independent directors and Chief Executive Officer.

9. More specifically, Solomon began marketing the Debtors' Assets by reaching out to potential purchasers and gauging their level of interest in acquiring the Assets. Solomon contacted 114 potential purchasers and identified sixty-seven (67) parties with interest in potentially purchasing the Assets. Solomon compiled an extensive information package, containing information about each of the Debtors' stores, as well as their corporate operations, which was designed to be shared with potential purchasers upon the signing of a nondisclosure agreement (an "**NDA**"). Of the parties interested in purchasing the Assets, sixty-seven (67) signed an NDA and were provided the information package.

10. Of the parties that signed an NDA and were provided the information package, four (4) continued to express a serious interest in acquiring the Assets and began discussing terms with the Debtors. Ultimately, two potential purchasers negotiated asset purchase agreements with the Debtors. The Debtors elected to pursue the offer made by TLI Bedrock LLC

(the "**Stalking Horse Bidder**" and its bid, the "**Stalking Horse Bid**"), and executed an asset purchase agreement (the "**Stalking Horse Purchase Agreement**") on July 13, 2020.

11.  The Stalking Horse Purchase Agreement provides that the Debtors could not solicit competing offers for the Assets during the thirty (30) days following execution of the Stalking Horse Purchase Agreement, while the Stalking Horse Bidder negotiated the terms of modified labor agreements with the unions representing the Debtors' employees.  Accordingly, Solomon stopped marketing the Assets from July 13 through the Commencement Date.  None of the potential purchasers Solomon has been in contact with to date has been willing to assume, in full, the Debtors' pension liability obligations or other obligations related to the Debtors' collective bargaining agreements.  Therefore, each potential bidder has requested that any sale of the Assets be free and clear of such liabilities.

12.  The prepetition marketing process for the Debtors' Assets has been extensive.  Solomon has contacted a total of 114 parties, four (4) of which have expressed interest in acquiring the Assets.  Following the Commencement Date, Solomon will continue to market the Assets with the goal of eliciting competing bids that are higher or otherwise better than the Stalking Horse Bid.  Solomon intends to notify each interested party of important information with respect to the sale process, the key terms of the Stalking Horse Bid, and the Bidding Procedures and key deadlines related thereto.  I believe that proceeding with a postpetition marketing process and a competitive bidding and auction process will result in the highest or best bid for the Assets, which is intended to maximize the value of the Assets and the Debtors' estates, and preserve jobs.

## Bidding Procedures

13.  The Bidding Procedures, among other things, set forth the conditions, requirements, and timing for the submission of Qualified Bids, as well as the proposed date of an

auction. Given the marketing efforts to date, I believe that these conditions and deadlines will facilitate an expeditious sale of the Assets while encouraging interested parties to participate in the sale process.

14. I believe the Bidding Procedures will provide ample notice and opportunity for interested parties to submit bids for the Assets. In addition, I believe an expeditious postpetition sale process is appropriate in light of the prepetition marketing process described above. Many of the potential bidders that I believe are most likely to make Qualified Bids were in contact with Solomon prior to the Commencement Date, had the opportunity to review diligence information and make proposals, and are aware of the Debtors' goal of effectuating a sale process. To ensure potential buyers are apprised of the postpetition sale process, Solomon intends to provide them with important information related to the Bidding Procedures and sale timeline, and I understand that the Debtors intend to serve them with notices related to the postpetition sale process. Moreover, I believe that new potential bidders that engage postpetition will have sufficient time to consider a transaction and develop a bid, as the Bid Deadline provides ample time for such bidding.

15. In addition, the Bidding Procedures and the Stalking Horse Purchase Agreement contain certain stalking horse bid protections. Specifically, the Stalking Horse Purchase Agreement provides for the payment of Termination Payment fee in the amount of $2,625,000, which is equal to 3.5% of the purchase price set forth therein, as well as an Expense Reimbursement for reasonable and documented expenses up to $550,000, in the event the Stalking Horse Bid is not selected as the Successful Bid. The Stalking Horse Purchase Agreement also provides an expense reimbursement (the Negotiated Expense Amount) for reasonable and documented expenses up to $750,000 if the Stalking Horse Purchase Agreement is terminated in the event the Sale Order does not include certain findings of fact and conclusions of law related to

the Stalking Horse Bidder's liability for union agreements and pension plans.  The Bidding Procedures also provide that if the Stalking Horse Bidder bids at the auction and is ultimately selected as the Successful Bidder, it will be entitled to a credit in the amount of the Termination Payment.

16. The Stalking Horse Bidder was unwilling to hold open its offer without assurance of the payment of the Termination Fee, Expense Reimbursement, and Negotiated Expense Amount under the terms and conditions set forth in the Stalking Horse Purchase Agreement and Bidding Procedures.  These bid protections, moreover, are intended to promote more competitive bidding for the Assets by inducing the Stalking Horse Bidder to hold its offer open as a minimum bid on which other bidders and the Debtors can rely.  The Stalking Horse Bid will encourage other bidders to participate in the sale process and provides assurance that the price at which the Assets are sold will reflect their maximum value.

17. I also understand that Bidding Procedures were heavily negotiated between the Debtors, the Stalking Horse Bidder, and the DIP Lender.

18. In sum, I believe the Bidding Procedures are designed to facilitate the most robust and competitive bidding process for the Assets that is possible under the circumstances. The Bidding Procedures also provide a framework for the Debtors to review, analyze, and compare all bids received to determine which bids provide the highest or best offer for the Assets and the maximum benefit to the Debtors' estates and stakeholders.  A sale transaction governed by the Bidding Procedures will serve the important objective of obtaining the highest or best value for the Assets, for the benefit of all parties in interest in these chapter 11 cases.

19. I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 23, 2020
      New York, New York

                                                            */s/ Scott Moses*
                                                            Managing Director
                                                           PJ Solomon, L.P.